*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANTONIO CADDELL,

        Defendant-Appellant.

FOR PUBLICATION
April 9, 2020
9:05 a.m.

No. 343750
Wayne Circuit Court
LC Nos. 16-007144-01-FC
          16-007204-01-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

RICCO RAFEAL WILLIAM-SALMON,

        Defendant-Appellant.

No. 343993
Wayne Circuit Court
LC No. 16-007204-02-FC

Before: MURRAY, C.J., and SWARTZLE and CAMERON, JJ.

MURRAY, C.J.

      Defendants Antonio Caddell and Ricco William-Salmon were tried jointly before separate juries. The charges against Caddell arose from two separate cases that were joined for trial. In LC No. 16-007204-01-FC, the jury convicted Caddell of first-degree premeditated murder, MCL 750.316(1)(a), conspiracy to commit first-degree murder, MCL 750.157a and MCL 750.316, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, related to the shooting death of Corey Reed. In LC No. 16-007144-01-FC, the jury convicted Caddell of first-degree premeditated murder for the death of Ben Keys,[1] conspiracy to commit

---

[1] The jury acquitted Caddell of an additional count of first-degree premeditated murder involving Laura Zechman.

-1-

first-degree murder involving Keys and Laura Zechman, solicitation of the murders of Keys and Zechman, MCL 750.157b, and felony-firearm. The trial court sentenced Caddell to life in prison without parole for the murder and conspiracy to commit murder convictions, 30 to 60 years in prison for the solicitation of murder conviction, and two years in prison for each felony-firearm conviction. Caddell appeals as of right in Docket No. 343750.[2] We vacate Caddell's convictions, and remand for retrial.

In Docket No. 343993, William-Salmon appeals as of right his jury trial convictions of first-degree premeditated murder for the death of Reed, conspiracy to commit first-degree murder, and felony-firearm. The trial court sentenced William-Salmon to life in prison without parole for the murder and conspiracy convictions, and two years in prison for the felony-firearm conviction. We affirm.

Defendants' convictions arise from their participation in the hired murders of three victims, Reed, Keys, and Zechman, allegedly in retaliation for an earlier "Eastside Barbershop shooting" on November 6, 2013. Reed was killed on Hull Street in Detroit on November 23, 2013. Keys and Zechman were killed inside a vehicle in Detroit on April 30, 2014. In LC No. 16-007204-01-FC, the prosecutor charged both Caddell and William-Salmon with first-degree premeditated murder, conspiracy to commit murder, and felony-firearm in connection with Reed's death. In LC No. 16-007144-01-FC, the prosecutor charged Caddell with two counts of first-degree premeditated murder, conspiracy to commit murder, solicitation of murder, and felony-firearm in connection with the deaths of Keys and Zechman.

William-Salmon initially pleaded guilty to second-degree murder, MCL 750.317, and felony-firearm in exchange for a sentence agreement of 13 to 22 years' imprisonment for the murder conviction and two years' imprisonment for the felony-firearm conviction, and his agreement to cooperate and testify truthfully against other codefendants. William-Salmon testified at Caddell's first trial in May 2017. The jury was unable to reach a verdict, and the court declared a mistrial. Thereafter, the trial court granted the prosecution's motion to vacate William-Salmon's plea on the ground that he violated his plea agreement to cooperate and provide truthful testimony at Caddell's trial. Defendants were later tried jointly in February 2018, and convicted of the crimes specified above.

Within two hours of submitting the case to the jury, the trial court received a note indicating that the Caddell jury felt deadlocked, and expressing concerns about Juror #3. Despite repeat instructions to the jury to "share your opinions and the reasons for them," and to "keep[] an open

---

[2] Although Caddell's convictions arise from two different cases that were joined for trial, Caddell's claim of appeal was filed only from LC No. 16-007204-01-FC, apparently because only that lower court number was listed on the Notice of Right to Timely Appeal and Request for Appointment of Attorney form filed in the trial court. However, the parties discuss both underlying cases in their briefs, and neither party suggests that the scope of Caddell's appeal was intended, or should be, limited only to LC No. 16-007204-01-FC. Because the same jury decided both cases, Caddell was convicted of first-degree murder and sentenced to life without parole in both cases, and the issues on appeal implicate the validity of Caddell's convictions in both cases, we exercise our authority under MCR 7.216(A)(7) to modify the claim of appeal to also include LC No. 16-007144-01-FC.

-2-

mind with regards to what each other has to say," but without "giving up your own opinion just for the sake of reaching a decision or just because other people disagree with you," the jury, less than two hours later, sent another note about the "completely closed off" juror who refused to articulate reasonable doubt. All of the jurors later signed a note that:

(1) Juror #3 was not participating in deliberations,

(2) Juror #3 stated that she had her mind "made up before [she] came in here,"

(3) Juror #3's emotions and beliefs, not facts, were her "driving force,"

(4) Juror #3 would not provide factual, rational support for her beliefs,

(5) Juror #3 would not even acknowledge actual evidence or the smallest of facts,

(6) Juror #3 frequently put her head down and closed her eyes,

(7) Juror #3 was disrespectful to other jurors, and

(8) Juror #3 had said, "You're not from the hood. You just don't understand."

Juror #3 also appeared late to court, and engaged in a shouting match with other jurors in which she used profanity. After discussing the situation with counsel, and reviewing federal caselaw[3] addressing this situation, the trial court decided to question Juror #3 separately from the other jurors. Juror #3 was brought out for questioning, and was properly cautioned not to disclose her or any other jurors' vote on any of the counts. After making a sarcastic comment under her breath (but heard only by the trial court and prosecutor), Juror #3 denied the allegations by the other jurors. She stated that she read from the notes she took during trial to her fellow jurors when supporting her view of the evidence. When confronted with the other jurors' allegation that she did not provide the facts and reasons supporting her position, she stated:

> I have shared. I've read from my notes why I answered certain questions, you know, what is my opinion, why I feel that way.
>
> I even came in here yesterday and wrote about the things on the paper that I had been thinking about all weekend long. I gave it to them, the head guy back there to read. He read them or maybe he read some of it. I think that not agreeing with–in the courtroom they told us to come up with reasonable doubt, and that is what I'm working toward because what I heard here.

She also denied initiating the shouting match overheard by the court. In deciding to remove Juror #3, the trial court stated,

---

[3] The court specifically cited to *United States v McGill*, 815 F3d 846 (CA DC, 2016), and *United States v Ebron*, 683 F3d 105 (CA 5, 2012).

-3-

I think in light of her answers in terms of what she said that, you know, presumably everybody else is wrong except her, and I think it really in essence does boil down to the notion of do I think that juror number three is being truthful with regards to her answers, and I do not believe that she is.

Juror #3 was then removed from the jury, and an alternate was placed onto it. The jury subsequently convicted Caddell as noted above.

## I. DOCKET NO. 343750 (DEFENDANT CADDELL)

### A. JURY DELIBERATIONS AND REMOVAL OF JUROR #3

With respect to the trial court's removal of Juror #3, Caddell makes two separate but related arguments. First, he argues that the trial court should have declared a mistrial instead of removing Juror #3. Second, Caddell argues that the trial court erred in removing Juror #3, and by removing Juror #3, his constitutional rights to a unanimous jury[4] and due process of law were violated.

### A. MOTION FOR MISTRIAL

Caddell argues that the trial court abused its discretion by failing to grant a mistrial at several points during jury deliberations. This Court reviews a trial court's decision regarding a motion for a mistrial for an abuse of discretion. *People v Dennis*, 464 Mich 567, 572; 628 NW2d 502 (2001). "An abuse of discretion occurs when the trial court 'chooses an outcome that falls outside the range of principled outcomes.' " *People v March*, 499 Mich 389, 397; 886 NW2d 396 (2016) (citation omitted).

"A mistrial should be granted only where the error complained of is so egregious that the prejudicial effect can be removed in no other way." *People v Gonzales*, 193 Mich App 263, 266; 483 NW2d 458 (1992). A mistrial may be granted if a jury is unable to reach a verdict. See *People v Riemersma*, 104 Mich App 773, 777-779; 306 NW2d 340 (1981); *Arizona v Washington*, 434 US 497, 509-510; 98 S Ct 824; 54 L Ed 2d 717 (1978). "[T]rial courts are to exercise caution in discharging the jury before a verdict is reached." *People v Lett*, 466 Mich 206, 216; 644 NW2d 743 (2002). Recently, in *People v Walker*, 504 Mich 267, 276-278; 934 NW2d 727 (2019), the Supreme Court explained:

---

[4] *State v Ramos*, 231 So 3d 44, 54; 2016-1199 (La App 4th Cir 11/2/17), *cert gtd*, __ US __; 139 S Ct 1318; 203 L Ed 2d 563 (2019), is currently before the United States Supreme Court to address whether a state criminal defendant has the right to a unanimous jury verdict under the Sixth Amendment of the United States Constitution as incorporated through the Fourteenth Amendment of the United States Constitution. As of now, it is not. See *McDonald v City of Chicago*, 561 US 742, 765 n 13; 130 S Ct 3020; 177 L Ed 2d 894 (2010) (recognizing that the Sixth Amendment right to a unanimous jury verdict in a criminal case has not yet been incorporated against the States). But our state constitution, Const 1963, art 1, § 14, provides criminal defendants with the right to a unanimous jury.

When a jury indicates it cannot reach a unanimous verdict, a trial court may give a supplemental instruction—commonly known as an *Allen*[5] charge—to encourage the jury to continue deliberating. *People v Sullivan*, 392 Mich 324, 329; 220 NW2d 441 (1974). The goal of such an instruction is to encourage further deliberation without coercing a verdict. *People v Hardin*, 421 Mich 296, 314; 365 NW2d 101 (1984). See *Allen v United States*, 164 US 492, 501; 17 S Ct 154; 41 L Ed 528 (1896) ("While undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury room. The very object of the jury system is to secure unanimity by a comparison of views . . . ."). "If the charge has the effect of forcing a juror to surrender an honest conviction, it is coercive and constitutes reversible error." *Sullivan*, 392 Mich at 334 (quotation marks and citation omitted).

In *Sullivan*, this Court adopted a standard deadlocked-jury instruction that has since been incorporated into our model jury instructions. *Id.* at 341; M Crim JI 3.12.[6] Although the model instruction is an example of an instruction that strikes the correct balance, it is not the only instruction that may properly be given. The relevant question is whether "the instruction given [could] cause a juror to abandon his [or her] conscientious dissent and defer to the majority solely for the sake of reaching agreement[.]" *Hardin*, 421 Mich at 314. The inquiry must consider the factual context in which the instruction was given and is conducted on a case-by-case basis. *Sullivan*, 392 Mich at 332-334.

Caddell argues that the trial court erred by denying a mistrial when it refused to accept that the jury was unable to reach a verdict after the jury sent a note—about a day after the court provided a deadlocked jury instruction—that one juror (Juror #3) was refusing to participate, and no further progress could be made without her participation. In *Hardin*, 421 Mich at 318 (quotation marks and citation omitted), it was explained that after a deadlocked jury instruction is provided and the jury has been unable to agree, a court may still require the jury to continue deliberations, and "may give or repeat an instruction." The *Hardin* Court warned, however, that the trial court " 'shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.' " *Id.* at 318-319, quoting American Bar Association (ABA) instruction 5.4(b).[7]

What the trial court was presented with, almost from the start of deliberations, was a situation in which it was advised that the jury's inability to reach a verdict was because of a lone juror's refusal to participate in the deliberation process. Like the trial court in *Hardin,* after the first few hours of deliberation, and after receiving a note from the jury only two hours after being

---

[5] *Allen v United States*, 164 US 492; 17 S Ct 154; 41 L Ed 528 (1896).

[6] M Crim JI 3.12 provides, in relevant part, "it is your duty to consult with your fellow jurors and try to reach agreement, if you can do so without violating your own judgment."

[7] M Crim JI 3.12 mirrors ABA instruction 5.4. *People v Pollick*, 448 Mich 376, 382 n 12; 531 NW2d 159 (1995). "Any substantial departure [from this instruction] shall be grounds for reversible error." *Sullivan*, 392 Mich at 342.

given the case, the trial court sent the jury home for the evening. When the jury returned the next day, it soon again indicated an inability to further deliberate, and the trial court then requested specific examples of the lone juror's refusal to participate in deliberations. At that point, only two days into deliberations after a 13-day trial, the court did not require, or threaten to require, the jury to deliberate for an unreasonable length of time, or for unreasonable intervals. *Id*. at 318-319, quoting ABA instruction 5.4(b). A new trial was not warranted at that point.

## B. REMOVING A JUROR DURING DELIBERATIONS

Caddell's arguments in support of a mistrial leads our discussion to Caddell's related, but more difficult argument, which is that the trial court's decision to remove Juror #3 and replace her with an alternate juror violated his state constitutional right to a unanimous verdict, see 1963 Const, art 1, § 14, and interfered with the secrecy of deliberations, depriving him of a fair trial. Although Caddell objected below to the trial court's removal of Juror #3, he did not do so on the basis of his constitutional rights to a fair trial and a unanimous verdict. Therefore, his constitutional arguments are unpreserved. *People v Hogan*, 225 Mich App 431, 438; 571 NW2d 737 (1997). Caddell's unpreserved constitutional claims are reviewed for plain error affecting his substantial rights. *People v Brown*, 326 Mich App 185, 192; 926 NW2d 879 (2018). "This generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *People v Shafier*, 483 Mich 205, 219-220; 768 NW2d 305 (2009) (quotation marks and citation omitted). "[R]eversal is only warranted if the error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity or public reputation of judicial proceedings[.]" *Id*. at 220 (quotation marks and citation omitted).

As with all issues we address on appeal, the first question we must answer–and often it is one of the more critical ones–is what standard to apply when reviewing the trial court's decision. Here, we know that the Legislature has granted trial courts with discretion to remove a juror throughout the trial proceedings, and thus, we apply the deferential abuse of discretion standard to the trial court's decision. See MCL 768.18 ("Should any condition arise during the trial of the cause which in the opinion of the trial court justifies the excusal of any of the jurors so impaneled from further service, he may do so and the trial shall proceed, unless the number of jurors be reduced to less than 12."), *People v Tate*, 244 Mich App 553, 559; 624 NW2d 524 (2001), and *People v Dry Land Marina, Inc*, 175 Mich App 322, 327; 437 NW2d 391 (1989) (The decision to call an alternate juror is a "reasonable alternative" to a mistrial). The trial court's factual findings are reviewed for clear error. *People v Garland*, 286 Mich App 1, 7; 777 NW2d 732 (2009). "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made." *People v Blevins*, 314 Mich App 339, 348-349; 886 NW2d 456 (2016).

We explained in *Tate*, 244 Mich App 562, "that, while a defendant has a fundamental interest in retaining the composition of the jury as originally chosen, he has an equally fundamental right to have a fair and impartial jury made up of persons able and willing to cooperate, a right that is protected by removing a juror unable or unwilling to cooperate." Again, "[r]emoval of a juror under Michigan law is therefore at the discretion of the trial court, weighing a defendant's fundamental right to a fair and impartial jury with his right to retain the jury originally chosen to decide his fate." *Id*.

Although the decisions in *Tate* and *Dry Land Marina* recognize the trial court's broad authority to remove jurors, those cases addressed significantly different circumstances from those

involved here. For example, in *Tate*, 244 Mich App at 560, we concluded that the trial court did not abuse its discretion by removing a juror who developed a possibly contagious rash after deliberations began. Similarly, in *Dry Land Marina*, 175 Mich App at 325, the juror was excused because she broke her arm the previous weekend, and was experiencing related problems. Both of these decisions dealt with circumstances unrelated to the jury's deliberative process, and thus did not address what authority a trial court had to delve into what was actually transpiring among jurors. Additionally, to establish good cause for the removal of a juror under MCR 6.411, it must be established that one of the reasons in MCR 2.511(D) exist, or that another "reason recognized by law" exists. The reasons set forth in MCR 2.511(D), except subparts (2) and (3), are, like the issues dealt with in *Tate* and *Dry Land Marina*, essentially unrelated to the jury's deliberative process. And, to determine their applicability does not require a court to discover the extent of a juror's participation in deliberations.

Here, of course, Juror #3 was not removed because of a medical condition or other objective physical restraint or factor that would impede her ability to serve on the jury, such as being subject to outside influence, bias, injury, or other similar situation. Instead, Juror #3 was removed because the trial court found that she was failing to adhere to her juror's oath by not engaging in deliberations, and had not since the start of deliberations. In making its ruling, the trial court looked to federal caselaw addressing the balance between removing a juror not following instructions, protecting the secrecy of deliberations, and preserving the right to a unanimous jury. We now turn to those and other decisions, because our appellate courts have yet to speak on the issue. *Auto Owners Ins Co v Seils*, 310 Mich App 132, 147 n 5; 871 NW2d 530 (2015) ("Cases from other jurisdictions are not binding precedent, but we may consider them to the extent this Court finds their legal reasoning persuasive.").

We must first determine the proper standard that a trial court should employ when deciding whether to remove a juror for refusing to deliberate. To do so, several important principles need to be recognized. First and foremost is the sanctity of private jury deliberations. The secrecy of jury deliberations is a vital part of our jury trial system, as secrecy provides jurors with the freedom to discuss all aspects of a case, and engage in the free-flow of ideas, concerns, and opinions regarding, as in this case, the guilt or innocence of a fellow community member. See, e.g., *Clark v United States*, 289 US 1, 13; 53 S Ct 465; 77 L Ed 993 (1933) ("Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world."); *United States v Thomas*, 116 F3d 606, 618 (CA 2, 1997) ("The secrecy of deliberations is the cornerstone of the modern Anglo-American jury system. . . . [It] is essential to the proper functioning of juries."); *In re Globe Newspaper Co*, 920 F2d 88, 94 (CA 1, 1990) ("It is undisputed that the secrecy of jury deliberations fosters free, open and candid debate in reaching a decision."). The secrecy of jury deliberations also plays an important role in isolating the jury from undue influence. *United States v Olano*, 507 US 725, 737-738; 113 S Ct 1770; 123 LEd2d 508 (1993) ("[T]he primary if not exclusive purpose of jury privacy and secrecy is to protect the jury's deliberations from improper influence."). And, of course, it is the trial courts that have always been the gatekeeper for protecting the secrecy of jury deliberations. *People v France*, 436 Mich 138, 150; 461 NW2d 621 (1990) (quotation marks and citation omitted) ("The secrecy of the deliberations of the jury is a responsibility of the trial judge."); *Wilson v Hartley*, 365 Mich 188, 190; 112 NW2d 567 (1961) ("The secrecy of the deliberations of the jury is a responsibility of the trial judge").

For these reasons, courts must always be cautious not to "intrude on the secrecy of the jury's deliberations." *United States v Brown*, 823 F2d 591, 596 (CA DC, 1987). As the court stated in *United States v Ebron*, 683 F3d 105, 125 (CA 5, 2012), quoting *Thomas*, 116 F3d at 620, "[p]reserving the secrecy of jury deliberations 'requires not only a vigilant watch against external threats to juror secrecy, but also strict limitations on intrusions from those who participate in the trial process itself, including counsel and the presiding judge.' "

Competing concerns are ensuring that jurors comply with their oath and that Michigan law regarding the competency of jurors to sit is followed. MCR 6.411; MCR 2.511(D). "It is well-settled that jurors have a duty to deliberate." *United States v Baker*, 262 F3d 124, 130 (CA 2, 2001). More than a century ago, the United States Supreme Court put into perspective each juror's duties relative to her other jurors:

> The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments, and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment, or that he should close his ears to the arguments of men who are equally honest and intelligent as himself. [*Allen*, 164 US at 501-502.]

Consistent with this, in every jury trial held in this state jurors are instructed about their obligations, which include the duty to keep an open mind and discuss the issues with their fellow jurors. M Crim JI 3.11 provides, in part:

> (3) A verdict in a criminal case must be unanimous. In order to return a verdict, it is necessary that each of you agrees on that verdict. In the jury room you will discuss the case among yourselves, but ultimately each of you will have to make up your own mind. Any verdict must represent the individual, considered judgment of each juror.

> (4) It is your duty as jurors to talk to each other and make every reasonable effort to reach agreement. Express your opinions and the reasons for them, but keep an open mind as you listen to your fellow jurors. Rethink your opinions and do not hesitate to change your mind if you decide you were wrong. Try your best to work out your differences.

> (5) However, although you should try to reach agreement, none of you should give up your honest opinion about the case just because other jurors disagree with you or just for the sake of reaching a verdict. In the end, your vote must be your own, and you must vote honestly and in good conscience.

Likewise, when the jury indicates that it cannot reach a unanimous decision, the deadlocked jury instruction is given, which reminds the jurors that "it is your duty to consult with your fellow jurors and try to reach agreement, if you can do so without violating your own judgment." M Crim JI 3.12(2). This instruction, which mirrors ABA instruction 5.4, provides jurors "with some guidance concerning their duties during deliberations." *People v Goldsmith*, 411 Mich 555, 559;

309 NW2d 182 (1981). "While they are obligated to deliberate with the goal in mind of reaching an agreement, the instruction also emphasizes that no juror need surrender his honest convictions concerning the evidence solely for the purpose of obtaining a unanimous agreement." *Id*. The deadlocked jury instruction "advises jurors that they should 'carefully and seriously consider the views of . . . fellow jurors,' and '[t]alk things over in a spirit of fairness and frankness.' " *Walker*, 504 Mich at 279, quoting M Crim JI 3.12(3). Subsection (4) of the instruction "addresses how jurors might meaningfully engage with one another rather than just stating their positions: 'You should not only express your opinion but also give the facts and reasons on which you base it.' " *Walker*, 504 Mich at 279, quoting M Crim JI 3.12(4).

These competing principles greatly complicate the trial court's task in determining whether to remove a juror during deliberations. Nevertheless, it is a task that must be performed,[8] and only the trial court can perform this function through a careful investigation of the circumstances:

> Balancing these two interests is a challenge a district court must undertake when faced with allegations of juror misconduct during deliberations. "[A] district court should be more cautious in investigating juror misconduct during deliberations than during trial, and should be exceedingly careful to avoid any disclosure of the content of deliberations." *United States v Boone*, 458 F3d 321, 329 (CA 3, 2006). While exercising due caution, a district court may conduct an investigation in situations where it is presented with substantial evidence of jury misconduct. *See id*. (holding that "where substantial evidence of jury misconduct—including credible allegations of jury nullification or of a refusal to deliberate—arises during deliberations, a district court may, within its sound discretion, investigate the allegations") (citations omitted). Such an investigation may be conducted via careful juror questioning or any other appropriate means. *Id*. (citations omitted). In adopting this standard, "we emphasize that a district court, based on its unique perspective at the scene, is in a far superior position than [we are] to appropriately consider allegations of juror misconduct, both during trial and during deliberations." *Id*. [*Ebron*, 683 F3d at 125-126.]

This investigation must be carefully circumscribed to protect the secrecy of deliberations, and to protect the state constitutional right to a unanimous verdict, but yet not so limited that it would preclude a fair determination of whether a juror is deliberating as required by law. As the *Thomas* court described it:

> Where, however, as here, a presiding judge receives reports that a deliberating juror is intent on defying the court's instructions on the law, the judge may well have no means of investigating the allegation without unduly breaching the secrecy of deliberations. There is no allegedly prejudicial event or relationship at issue, nor is the court being asked to assess whether a juror is so upset or otherwise distracted that he is unable to carry out his duties. Rather, to determine

---

[8] As the trial court did here, when a refusal to deliberate is first presented to the court, generally a court should first reinstruct the jury on any necessary issue, such as the jurors' duties or what it means to be deadlocked.

whether a juror is bent on defiant disregard of the applicable law, the court would generally need to intrude into the juror's thought processes. Such an investigation must be subject to strict limitations. Without such an inquiry, however, the court will have little evidence with which to make the often difficult distinction between the juror who favors acquittal because he is purposefully disregarding the court's instructions on the law, and the juror who is simply unpersuaded by the Government's evidence. Yet this distinction is a critical one, for to remove a juror because he is unpersuaded by the Government's case is to deny the defendant his right to a unanimous verdict. [*Thomas*, 116 F3d at 621.]

As was done by the esteemed trial judge here,

[t]he inquiry should focus on the conduct of the jurors and the *process* of deliberations, rather than the *content* of discussions. The court's inquiry should cease if the trial judge becomes satisfied that the juror in question is participating in deliberations and does not intend to ignore the law or the court's instructions. Finally, we recognize that if inquiry occurs, it should reflect an attempt to gain a balanced picture of the situation; it may be necessary to question the complaining juror or jurors, the accused juror, *and* all or some of the other members of the jury. [*State v Elmore*, 155 Wash 2d 758, 774; 123 P3d 72 (2005).]

Finally, after conducting this limited investigation, the court must determine whether the juror is actually engaging in misconduct by refusing to deliberate. We find instructive the discussion of what constitutes a "refusal to deliberate" in *People v Cleveland*, 25 Cal 4th 466, 485; 21 P3d 1225 (2001):

[P]roper grounds for removing a deliberating juror include refusal to deliberate. A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury. The circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge. Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge. A juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views.

The courts are split on the verbiage for a test to apply in determining whether a juror is refusing to deliberate, though all three variations err on the side of keeping a juror on the panel if there is some possibility that removal is sought because of the juror's views on the case.

The United States Court of Appeals for the District of Columbia Circuit has held that if there is "any possibility" that the subject juror is being pinpointed because of her view of the government's case, the juror should remain on the jury. *Brown*, 823 F2d at 596 (emphasis added) (court concluded that "if the record evidence discloses *any possibility* that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request."). Somewhat differently, the Third and Eleventh Circuit Courts of Appeal have held that " 'a juror should be excused only when no "substantial possibility" exists that she is basing her decision on the sufficiency of the evidence.' " *United States v Kemp*, 500 F3d 257, 304 (CA 3, 2007), quoting *United States v Abbell*, 271 F3d 1286, 1302 (CA 11, 2001). In *United States v Symington*, 195 F3d 1080, 1087 (CA 9, 1999), the Ninth Circuit Court of Appeals held that a court must not dismiss a juror "if the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case." Other courts have utilized this same "reasonable possibility" formulation, see *Elmore*, 155 Wash 2d at 761, and *Wofford v Woods*, 352 F Supp 3d 812, 823 (ED Mich, 2018), because it strikes a good balance between the rights at issue and the discretion to be exercised by the trial court:

> The "any reasonable possibility" standard is not insurmountable, but it is sufficiently high to err on the side of protecting important constitutional rights. *See Symington*, 195 F3d at 1087 n 5 (The reasonable possibility standard, in this context, "is a threshold at once appropriately high and conceivably attainable."). Moreover, this standard takes into account our presumption that jurors have followed the court's instructions in that it requires the court, where there is conflicting evidence, to retain a juror if there is any reasonable possibility that the dispute among the jury members stems from disagreement on the merits of the case. Emphasis on the trial judge's discretion recognizes that the trial court is "uniquely situated to make the credibility determinations that must be made in cases like this one: where a juror's motivations and intentions are at issue." *Abbell*, 271 F3d at 1303. [*Elmore*, 155 Wash 2d at 777-778 (citations omitted in part).]

We now turn to some analogous decisions to assist us in reviewing the specific decision of the trial court in removing Juror #3. Caddell relies on *Brown*, 823 F2d 591, a decision which, as we noted, utilized the "any possibility" test. In *Brown* a juror (Bernard Spriggs) sent a note to the trial court stating that he could no longer discharge his duties on the jury. *Id*. at 594. The court briefly questioned the juror concerning his reasons, and the juror indicated that he had difficulties with " 'the way [the Racketeer Influenced and Corrupt Organizations (RICO) statute is] written and the way the evidence has been presented.' " *Id*. at 594. To avoid intruding on the secrecy of deliberations, the court did not further clarify the juror's request. *Id*. at 595. The prosecutor then argued that dismissal was proper because the juror expressed an unwillingness to follow the court's instructions on the law, while defense counsel argued that the juror's concern stemmed from the prosecutor's failure to sufficiently prove the RICO counts. *Id*. The court agreed with the prosecutor, and dismissed the juror for refusing to follow the law. *Id*.

On appeal, the Court of Appeals for the District of Columbia Circuit concluded that the dismissal violated the defendant's Sixth Amendment right to be convicted by a unanimous jury because the record indicated a "possibility that [the juror] requested to be discharged because he believed that the evidence offered at trial was inadequate to support a conviction." *Id*. at 596. The court reasoned that "when a request for dismissal stems from the juror's view of the sufficiency of

the evidence that the government offered at trial, a judge may not discharge the juror: the judge must either declare a mistrial or send the juror back to deliberations with instructions that the jury continue to attempt to reach agreement." *Id*. In confronting "the problem that the reasons underlying a request for a dismissal will often be unclear[,]" the court concluded that "if the record evidence discloses *any possibility* that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request." *Id*. (emphasis added).

*Wofford*, a habeas case, is analogous to the case at bar. There, the state trial court received several notes from the jury indicating that they could not agree, and the court twice gave the deadlocked jury instruction. *Wofford*, 352 F Supp 3d at 814. The holdout juror (Juror M) eventually retained her own attorney to inform the court that the other jurors were harassing her. *Id*. Instead of declaring a mistrial, the trial court removed Juror M for violating its instruction not to discuss the case with anyone; an alternate juror was seated, and the defendant was convicted. *Id*. This Court affirmed the defendant's conviction, holding that the trial court did not abuse its discretion when it removed the Juror M under *Tate*, 244 Mich App 562, because the juror had failed to cooperate. *People v Wofford*, unpublished per curiam opinion of the Court of Appeals, issued March 17, 2015 (Docket No. 318642), pp 2-3.

The district court determined that the defendant was deprived of his Sixth Amendment right[9] to a unanimous verdict because a reasonable possibility existed that the impetus for Juror M's dismissal was her status as the holdout. *Wofford*, 352 F Supp 3d at 823. Because the trial court received several notes indicating that there was a holdout juror, and the deadlocked jury instruction was given twice, the record evidence established "a reasonable possibility that what led to the notes, what led to Juror M contacting an attorney, and what put the issue of Juror M's removal before the judge was Juror M's views about the merits of the case." *Id*. "So even if the trial judge removed Juror M because she violated his instructions, there remains a reasonable possibility that the 'impetus' for Juror M's removal was that she was the holdout." *Id*. (citations omitted).

Turning back to the trial court's decision here, although the trial court went to great lengths to follow the appropriate procedure of investigating juror misconduct while protecting the secrecy of jury deliberations, we conclude that the record evidence discloses a reasonable possibility that the unintended reason for removing Juror #3 stemmed from her views on the merits of the case. For two reasons, we conclude that the record evidence establishes a reasonable possibility that what led to the multiple notes from the jury, and what put the issue of Juror #3's removal before the judge, was her view on the merits of the case and her status as the holdout juror. See *Symington*, 195 F3d at 1088 n 8 ("Indeed, it appears that it was only because of their disagreement with [the juror] on the merits that the other jurors had occasion to question her ability to deliberate.) and 1088 n 9 ("[B]ecause it was reasonably possible that the problems all stemmed from the other

---

[9] The court subsequently recognized that the Sixth Amendment right to a unanimous verdict has not been incorporated against the states, but still ruled that the defendant's right to due process was violated. *Wofford v Woods*, unpublished decision of the United States District Court for the Eastern District of Michigan, issued January 9, 2019 (Docket No. 16-cv-13083).

-12-

jurors' disagreement with [the holdout juror's] position on the merits, it was error to continue the case without her.").

First, the note signed by all eleven other jurors reflects that a number of the issues they had with Juror #3 could have stemmed from her disagreement with the other jurors regarding the merits of the case. For example, one complaint about Juror #3 was that her decision-making was driven by "emotions and beliefs, not facts." But to know that emotions were controlling her thoughts means Juror #3 was *communicating* her thoughts. Another complaint was that Juror #3 "would not provide factual, rational support for her beliefs." Again, the implication is that Juror #3 provided support for her beliefs, they were just not "factual" or "rational" to the other eleven jurors. Finally, the eleven jurors complained that Juror #3 "would not even acknowledge actual evidence or the smallest of facts," again implying discussion about the case with Juror #3, but frustration with her not accepting "actual evidence or the smallest of facts." Though the other complaints more directly addressed concerns that Juror #3 was not deliberating, because she had made her mind up from the start, this made the evidence from the note quite equivocal.

Second, Juror #3 stated that she participated in deliberations, and although she perhaps did not deliberate effectively with the other jurors, she relied upon her notes to make her decision and read them to her fellow jurors. When confronted with the other jurors' allegation that she did not provide the facts and reasons supporting her position she stated:

> I have shared. I've read from my notes why I answered certain questions, you know, what is my opinion, why I feel that way.

> I even came in here yesterday and wrote about the things on the paper that I had been thinking about all weekend long. I gave it to them, the head guy back there to read. He read them or maybe he read some of it. I think that not agreeing with–in the courtroom they told us to come up with reasonable doubt, and that is what I'm working toward because what I heard here.

Juror #3 also repeatedly stated that she had not entered deliberations with her mind made up, and that she was focusing on the reasonable doubt standard. She also indicated that although curse words had been used the day before, everyone was presently fine in the jury room, and she did not take anything said during deliberations personal. These statements, admittedly read from a cold record, reveal a juror who was deliberating. Perhaps not fully engaged, but one who understood her obligations, and who was attempting to fulfill them.

We are acutely aware that we are reviewing a cold record, and that we did not see Juror #3 when she spoke to the court, nor do we know what she purportedly said with sarcasm at the start of the hearing. Nevertheless, despite the fact that the trial court is entitled to make a credibility determination regarding juror misconduct, we conclude that the trial court crossed the threshold into the deliberative process by discharging a reluctant juror who repeatedly said that she was minimally cooperating. In doing so we acknowledge that a trial court's ability to make credibility determinations under these circumstances presumes that removal will not be limited to jurors who *admit* to refusing to deliberate. Otherwise there would be no need to make credibility determinations. But because there was a good deal of conflicting evidence on whether she was deliberating, and given that only a minimal investigation can be conducted to determine what the real concerns are, we must err on the side of protecting the defendant's rights:

-13-

We may not be able to say for a certainty that Spriggs' desire to leave the jury stemmed from his view of the adequacy of the government's evidence. But we cannot say with any conviction that Spriggs' request to be dismissed stemmed from something *other* than this view. Given the possibility—which in this case we think a likelihood—that Spriggs' desire to quit deliberations stemmed from his belief that the evidence was inadequate to support a conviction, we must find that his dismissal violated the appellants' right to a unanimous jury verdict. [*Brown*, 823 F2d at 597.]

We are therefore firmly of the opinion that when, as is the case here, a juror specifically indicates that she is engaging in some form of exchange with her fellow jurors, and there is other evidence to support that possibility, a trial court should deem that sufficient to keep the juror on the panel so as to avoid a reasonable possibility that the juror is being removed for her views on the merits of the case presented by the government.

By erring on the side that a juror is properly following her instructions on how to deliberate, we can best preserve the state constitutional right to a unanimous jury, and avoid any unnecessary intrusion into private jury deliberations. If Juror #3 presented a situation like that in *Baker*, where the juror admitted to (1) making her mind up before deliberations, and (2) refusing to participate in discussions from the start of deliberations, *Baker*, 262 F3d at 131-132, we would uphold the trial court's decision without hesitation. But, for the reasons expressed above, the actions of Juror #3 did not rise to the level of refusing to deliberate. *Cleveland*, 25 Cal 4th at 485. Therefore, Caddell was deprived of his state constitutional right to a unanimous verdict, a plain error affecting his substantial rights, and he is entitled to a retrial.

Although ordering a new trial resolves both of Caddell's related arguments on appeal, we address Caddell's remaining issue on appeal should it arise on retrial.

## B. OTHER-ACTS EVIDENCE

Caddell argues that evidence of another murder that occurred around October 15, 2013, was improperly admitted at trial, contrary to MRE 404(b). Although William-Salmon objected to this evidence, and Caddell joined in the objection, the trial court did not rule on the objection at that time, and Caddell never renewed his objection. Accordingly, this issue is unpreserved. *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007). Therefore, we review this issue for plain error affecting Caddell's substantial rights. *People v Coy*, 258 Mich App 1, 12; 669 NW2d 831 (2003).

MRE 404(b)(1) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

Relevant other-acts evidence is admissible unless the proponent's sole theory of relevance is to show the defendant's criminal propensity to prove that he committed the charged offenses. *People v VanderVliet*, 444 Mich 52, 63; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994). Accordingly, MRE 404(b)(1) is inclusionary rather than exclusionary. *Id*. at 64. In *People v Smith*, 282 Mich App 191, 194; 772 NW2d 428 (2009), this Court explained:

> In deciding whether to admit evidence of other bad acts, a trial court must decide: first, whether the evidence is being offered for a proper purpose, not to show the defendant's propensity to act in conformance with a given character trait; second, whether the evidence is relevant to an issue of fact of consequence at trial; third, [under MRE 403] whether its probative value is substantially outweighed by the danger of unfair prejudice in light of the availability of other means of proof; and fourth, whether a cautionary instruction is appropriate.

In *People v Pickens*, 446 Mich 298, 336-337; 521 NW2d 797 (1994), our Supreme Court explained what can constitute unfair prejudice under MRE 403:

> Obviously, evidence is offered by an advocate for the always clear, if seldom stated, purpose of "prejudicing" the adverse party. Recognizing this, the Supreme Court in adopting MRE 403 identified only unfair prejudice as a factor to be weighed against probative value. This unfair prejudice refers to the tendency of the proposed evidence to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock. [(Citation and quotation marks omitted).]

In *People v Johnigan*, 265 Mich App 463, 465; 696 NW2d 724 (2005), the defendant argued that the trial court abused its discretion and violated MRE 404(b) by admitting evidence from an informant that the defendant told him about a separate murder and unrelated weapons stockpiled in the defendant's house. This Court explained that the evidence was admissible under MRE 404(b) for two purposes. First, the evidence was admissible to prove motive, namely, that the defendant acted in his role as a hired killer. *Id*. Second, the evidence demonstrated a lack of mistake (or fabrication) in the informant's accusations. *Id*. at 466-467.

Similarly, here, evidence of the Eastside Barbershop shooting and the subsequent retaliatory hits between the feuding sides, including the Chapmans (Edward Chapman, "Ed Bone" or "Bone") and Larry Walker ("Shank"), were relevant to Caddell's motive for committing the instant offenses as a hit man for the Chapmans. Mark Slappey's statements to the police that, sometime after October 15, 2013, Caddell said that he completed one hit on behalf of the Chapmans against one of Shank's men, and Caddell received payment in the form of money and a car, was probative of Caddell's role as a hired killer in these retaliatory killings. "Though motive is not an essential element . . . , it is generally relevant to show the intent necessary to prove murder." *People v Herndon*, 246 Mich App 371, 412-413; 633 NW2d 376 (2001). Although the evidence of the series of retaliatory murders was inherently prejudicial, Caddell has not established any unfair prejudice because of the evidence's tendency to elicit bias, sympathy, anger, shock, or other considerations extraneous to the merits of the charged offenses, which substantially outweighed the probative value of the evidence. *Pickens*, 446 Mich at 336-337. Accordingly, Caddell has not established that the evidence was inadmissible under MRE 404(b)(1).

-15-

## II. DOCKET NO. 343993 (DEFENDANT WILLIAM-SALMON)

## A. VACATION OF GUILTY PLEA

William-Salmon first argues that the trial court erred by concluding that he failed to comply with the terms of his plea agreement, and thereby granting the prosecutor's motion to vacate his guilty plea. He also argues that the prosecutor's motion to vacate his guilty plea was not timely brought. He maintains that the prosecutor should have brought the motion immediately after his testimony at Caddell's first trial, rather than waiting for the outcome of that trial—a hung jury. A trial court's decision on a motion to vacate a plea is reviewed for an abuse of discretion. *People v Martinez*, 307 Mich App 641, 646; 861 NW2d 905 (2014). "An abuse of discretion occurs when the trial court's decision is outside the range of principled outcomes." *Id*. (quotation marks and citation omitted).

MCR 6.310 provides, in relevant part:

(A) Withdrawal Before Acceptance. The defendant has a right to withdraw any plea until the court accepts it on the record.

(B) Withdrawal After Acceptance but Before Sentence. Except as provided in subsection (3), after acceptance but before sentence,

(1) a plea may be withdrawn on the defendant's motion or with the defendant's consent, only in the interest of justice . . . .

* * *

(C) Motion to Withdraw Plea After Sentence.

(1) The defendant may file a motion to withdraw the plea within 6 months after sentence or within the time provided by subrule (C)(2).

(2) If 6 months have elapsed since sentencing, the defendant may file a motion to withdraw the plea if:

(a) the defendant has filed a request for the appointment of counsel pursuant to MCR 6.425(G)(1) within the 6-month period,

(b) the defendant or defendant's lawyer, if one is appointed, has ordered the appropriate transcripts within 28 days of service of the order granting or denying the request for counsel or substitute counsel, unless the transcript has already been filed or has been ordered by the court under MCR 6.425(G), and

(c) the motion to withdraw the plea is filed in accordance with the provisions of this subrule within 42 days after the filing of the transcript. If the transcript was filed before the order appointing counsel or substitute counsel, or the order denying the appointment of counsel, the 42-day period runs from the date of that order.

(3) Thereafter, the defendant may seek relief only in accordance with the procedure set forth in subchapter 6.500.

* * *

(D) Preservation of Issues. A defendant convicted on the basis of a plea may not raise on appeal any claim of noncompliance with the requirements of the rules in this subchapter, or any other claim that the plea was not an understanding, voluntary, or accurate one, unless the defendant has moved to withdraw the plea in the trial court, raising as a basis for withdrawal the claim sought to be raised on appeal.

(E) Vacation of Plea on Prosecutor's Motion. On the prosecutor's motion, the court may vacate a plea if the defendant has failed to comply with the terms of a plea agreement.

"The trial court may exercise its discretion to vacate an accepted plea only under the parameters of the court rule." *People v Strong*, 213 Mich App 107, 111-112; 539 NW2d 736 (1995).

The terms of William-Salmon's plea agreement required him to "cooperate and testify, if needed." As this Court explained in *People v Abrams*, 204 Mich App 667, 672; 516 NW2d 80 (1994) (citations omitted),

cooperation agreements that affect the disposition of criminal charges must be reviewed within the context of their function to serve the administration of criminal justice. Contractual analogies may not be applicable, and so the terms of an agreement must be reviewed to determine whether the ends of justice are served by enforcing the terms.

In *People v Hannold*, 217 Mich App 382, 384, 390; 551 NW2d 710 (1996), overruled in part on other grounds by *People v Smart*, 497 Mich 950 (2015), the defendant entered a plea agreement that required his " 'assistance to the police including testimony and full statement in an investigation involving John Hud Grover.' " The defendant later "changed his story and failed to testify at Grover's preliminary examination." *Hannold*, 217 Mich App at 390. The defendant's "breach led to the dismissal of charges against Grover," and then the trial court granted the prosecutor's motion to set aside the defendant's plea. *Id*. at 384-385, 390. This Court concluded that the trial court did not clearly err by finding that the defendant breached his plea agreement, and therefore the trial court did not abuse its discretion by vacating the plea. *Id*. at 387-391.

After entering his plea and agreeing to cooperate and testify, William-Salmon testified at Caddell's first trial. William-Salmon's testimony at Caddell's first trial was evasive and replete with contradictions. When questioned about Reed's murder, William-Salmon initially testified, "It's been so long I can't remember everything," and denied much of the testimony that he had admitted at his plea hearing, which occurred only a week earlier. These denials repeatedly required the prosecutor to rehabilitate his testimony with questioning and citation to the plea transcript. After admitting that the contents of the plea transcript were true, William-Salmon nevertheless repeated some of the contradictory testimony. William-Salmon also demonstrated a lack of cooperation during trial regarding jail calls. He maintained that he would only admit that he had

-17-

said something in a jail call if the prosecutor first located the call and played it for the jury. Moreover, he attempted to whitewash the contents of calls that would support an inference that Caddell was culpable.

Despite the fact that some of his testimony provided sufficient evidence to support a conviction of Caddell for Reed's murder, the trial court found that the inconsistencies between William-Salmon's testimony and the evidence and his evasive testimony called his credibility into question. Given William-Salmon's numerous inconsistencies, contradictions, and evasive testimony, the trial court did not clearly err by concluding that he failed to comply with the terms of his plea agreement at Caddell's trial. MCR 6.310(E).

Furthermore, despite William-Salmon's inconsistent and evasive testimony at Caddell's trial, the prosecutor gave William-Salmon another opportunity to cooperate after the trial. When the court asked the prosecutor at trial if she intended to move to vacate William-Salmon's plea, the prosecutor replied that she would only file the motion if William-Salmon did not cooperate with investigators who planned to visit that weekend. During that May 14, 2017 visit by detectives, William-Salmon failed to cooperate with regard to other coconspirators. As a result, the prosecutor filed the motion based on both William-Salmon's lack of truthfulness at Caddell's trial, and his lack of overall cooperation. His subsequent lack of cooperation with regard to other coconspirators was alone grounds for vacating his plea agreement.

We also reject William-Salmon's argument that the prosecutor's motion to vacate his guilty plea was not timely filed because it was not brought immediately after William-Salmon testified at Caddell's trial, but rather, was filed shortly after the court declared a mistrial at Caddell's first trial because the jury was unable to reach a verdict. The plain language of MCR 6.310(E) sets no limits on when the prosecutor must file the motion to vacate a plea. Interpretation of a court rule, which includes the rules of evidence, is subject to the same basic principles that govern statutory interpretation. *Smith v Henry Ford Hosp*, 219 Mich App 555, 558; 557 NW2d 154 (1996). We begin with the plain language of the court rule. *People v Phillips*, 468 Mich 583, 589; 663 NW2d 463 (2003). "When that language is unambiguous, we must enforce the meaning expressed, without further judicial construction or interpretation." *Id*. (quotation marks and citations omitted). Common words must be understood to have their everyday, plain meaning. *Id*.

MCR 6.310(E) provides that a court may vacate a plea on a prosecutor's motion if "the defendant has failed to comply with the terms of a plea agreement." The rule does not delineate when the prosecutor's motion must be filed or granted. By contrast, other portions of MCR 6.310 specifically limit when a defendant may move to withdraw a plea, and what is required at each timeframe. For example, MCR 6.310(A) addresses withdrawing a plea before acceptance, MCR 6.310(B) addresses withdrawing a plea after acceptance, but before sentencing, and MCR 6.310(C) addresses withdrawing a plea during the six months after sentencing. Had the drafters intended to limit when a prosecutor could file a motion to vacate a plea, they would have included similar limiting language in MRE 6.310(E). The history of this court rule also shows that language from a 1989 amendment allowing the court to vacate the plea on the prosecutor's motion "before sentencing" was removed in subsequent amendments. MCR 6.310 (staff comment to 1989 adoption). Hence, the prosecution's motion, filed less than three weeks after Caddell's first trial ended, and after William-Salmon refused to cooperate with investigators, was not untimely. The trial court did not abuse its discretion by granting the prosecutor's motion to vacate William-Salmon's guilty plea.

## B. EVIDENCE OF GUILTY PLEA

Next, William-Salmon argues that the trial court erred by allowing the prosecutor to introduce evidence of his earlier guilty plea. We review the trial court's decision to admit evidence for an abuse of discretion. *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014).

William-Salmon argues that evidence of his earlier guilty plea was inadmissible under MRE 410, which provides, in relevant part:

> Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:
>
> (1) A plea of guilty which was later withdrawn;
>
> (2) A plea of nolo contendere, except that, to the extent that evidence of a guilty plea would be admissible, evidence of a plea of nolo contendere to a criminal charge may be admitted in a civil proceeding to support a defense against a claim asserted by the person who entered the plea;
>
> (3) Any statement made in the course of any proceedings under MCR 6.302 or comparable state or federal procedure regarding either of the foregoing pleas; or
>
> (4) Any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.

William-Salmon's reliance on this rule is misplaced because he did not *withdraw* his plea under MCR 6.310(A), (B), or (C). Rather, the prosecutor moved to *vacate* the plea, and the trial court granted the motion under MCR 6.310(E). Because MRE 410(1) only precludes evidence of a plea of guilty that was later *withdrawn*, not *vacated*, and William-Salmon's statements at the plea hearing were otherwise admissible under MRE 801(d)(2)(A) (a statement is not hearsay if it is the admission of a party-opponent), the trial court did not abuse its discretion by admitting William-Salmon's statements related to his plea.

## C. SLAPPEY'S PRIOR STATEMENTS

William-Salmon next argues that the trial court abused its discretion by allowing the prosecutor to introduce portions of Slappey's prior statements at trial under the forfeiture-by-wrongdoing rule. William-Salmon argues that the statements were inadmissible hearsay, and their admission also violated his constitutional right of confrontation.

This Court reviews a trial court's decision to admit evidence for an abuse of discretion. *Chelmicki*, 305 Mich App at 62. The trial court's factual findings are reviewed for clear error. *Garland*, 286 Mich App at 7. "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made." *Blevins*, 314 Mich App at 348-349.

Slappey's prior statements qualify as hearsay. MRE 801. Hearsay is not admissible except as provided by the rules of evidence. MRE 802; *Merrow v Bofferding*, 458 Mich 617, 626; 581

NW2d 696 (1998). In addition, in every criminal trial, the federal and state constitutions protect a defendant's right to be confronted with the witnesses against him. US Const, Am VI; Const 1963, art 1, § 20. "The Confrontation Clause of the Sixth Amendment bars the admission of 'testimonial' statements of a witness who did not appear at trial, unless the witness was unavailable to testify and the defendant had a prior opportunity to cross-examine the witness." *People v Walker* (*On Remand*), 273 Mich App 56, 60-61; 728 NW2d 902 (2006). " 'The right of confrontation insures that the witness testifies under oath at trial, is available for cross-examination, and allows the jury to observe the demeanor of the witnesses.' " *People v Watson*, 245 Mich App 572, 584; 629 NW2d 411 (2001), quoting *People v Frazier* (*After Remand*), 446 Mich 539, 543; 521 NW2d 291 (1994).

The trial court ruled that Slappey's prior statements were admissible under MRE 804(b)(6), and did not violate William-Salmon's constitutional right of confrontation. In *People v Burns*, 494 Mich 104, 110-111; 832 NW2d 738 (2013) (footnotes omitted), our Supreme Court explained:

> A defendant can forfeit his right to exclude hearsay by his own wrongdoing. MRE 804(b)(6) provides that a statement is *not* excluded by the general rule against hearsay if the declarant is unavailable, and the "statement [is] offered against a party that has engaged in or encouraged wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." This rule, commonly known as the forfeiture-by-wrongdoing rule, . . . .

> . . . The forfeiture doctrine not only provides a basis for an exception to the rule against hearsay; it is also an exception to a defendant's constitutional confrontation right. Insofar as it applies to the Sixth Amendment, however, the forfeiture doctrine requires that the defendant must have specifically intended that his wrongdoing would render the witness unavailable to testify.

The Court clarified that "[t]o admit evidence under MRE 804(b)(6), the prosecution must show by a preponderance of the evidence that: (1) the defendant engaged in or encouraged wrongdoing; (2) the wrongdoing was intended to procure the declarant's unavailability; and (3) the wrongdoing did procure the unavailability." *Id*. at 115. In addition, the Court noted: "While the timing of the wrongdoing is by itself not determinative, it can inform the inquiry: a defendant's wrongdoing *after* the underlying criminal activity has been reported or discovered is inherently more suspect, and can give rise to a strong inference of intent to cause a declarant's unavailability." *Id*. at 116.

Relying on Slappey's statements when refusing to testify, as well as recorded jail calls from Caddell and William-Salmon and other evidence of their threats against Slappey and his family members, the trial court found that defendants made a concerted effort to pressure and intimidate Slappey with the specific intent of precluding his testimony. Accordingly, the court found that defendants engaged in wrongdoing. The trial court noted that Slappey had voluntarily cooperated with the police and prosecutor since 2014, but then, in 2016, despite a no-contact order with defendants, Slappey was transported to court with them, and handcuffed to Caddell. Thereafter, Slappey refused to testify at the preliminary examination despite being held in contempt of court. The court also cited evidence of defendants' other attempts to pressure Slappey, including: (1) visits from Caddell's relatives, (2) shooting the windows of Slappey's home, and (3) assaults and intimidation of Slappey in jail at the direction of Caddell and William-Salmon. The trial court found "that both defendants engaged in an encouraging wrongdoing to pressure and prevent Mr. Slappey from coming to testify," and that "the wrongdoing that took place, the threats, that the

-20-

harassment, the shooting out of the windows were intended for the purpose of procuring Mr. Slappey's unavailability at trial and that this wrongdoing has in fact caused his unavailability."

Unlike the defendant's warnings to the victim in *Burns*, 494 Mich at 115, which occurred contemporaneously with the offense, Caddell's and William-Salmon's wrongdoing with regard to Slappey occurred during the investigation and prosecution of the case, which allowed a strong inference of intent to cause Slappey's unavailability. *Burns*, 494 Mich at 116. Moreover, given Slappey's statements that "I'm not going to end up on a slab," and his refusal to testify because he did not want to be next on the hit list, the trial court did not clearly err by finding that defendants' wrongdoing procured Slappey's unavailability. Therefore, the trial court did not abuse its discretion by admitting Slappey's prior statements under the forfeiture-by-wrongdoing rule in MRE 804(b)(6). Further, given the trial court's express finding that "the wrongdoing that took place . . . [was] intended for the purpose of procuring Mr. Slappey's unavailability at trial," which again is not clearly erroneous, the admission of Slappey's statements did not violate William-Salmon's constitutional right of confrontation. *Burns*, 494 Mich at 111.

## D. RELEVANCE

William-Salmon also argues that evidence of the Keys and Zechman murders was not relevant to his case, and the admission of this evidence at his joint trial with Caddell was more prejudicial than probative under MRE 403.

This Court reviews the trial court's decision to admit evidence for an abuse of discretion. *Chelmicki*, 305 Mich App at 62. Generally, "[a]ll relevant evidence is admissible," and "[e]vidence which is not relevant is not admissible." MRE 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401.

The prosecutor's theory of the case was that William-Salmon conspired with Caddell and others to perform hits on behalf of the Richbows (David Richbow) and the Chapmans. Contrary to his argument on appeal, the charge for conspiracy was not limited to the Reed murder. Rather, as the prosecutor argued at trial, William-Salmon's jail calls also evidenced his participation in the conspiracy to murder Keys and Zechman. The trial court instructed the jury that the agreement that formed the basis for the conspiracy charge was an agreement that "took place or continued during the period of . . . November 23rd of 2013 until April 30th of 2014," and thus could encompass an agreement that related to the murders of Keys and Zechman. William-Salmon admitted that he spoke to Caddell on the phone about "people spending money to put hits out on people," and he told Caddell that he would help find one of the victims. William-Salmon also admitted to connecting another person with Caddell to help perform the hits. In addition, the record demonstrated that Caddell's group had failed to murder Keys on several occasions because Zechman had been present. The group did not want to kill her because there were rumors that she was pregnant. William-Salmon's statement to Caddell to "f**k her" established his contribution to the plan to kill both Keys and Zechman, regardless of the potential pregnancy. Therefore, evidence of the Keys and Zechman murders was relevant to the charge of conspiracy in William-Salmon's case.

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or

-21-

by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403. "All relevant evidence is prejudicial; it is only unfairly prejudicial evidence that should be excluded." *People v McGhee*, 268 Mich App 600, 613-614; 709 NW2d 595 (2005). William-Salmon notes that he was not charged with the murders of Keys and Zechman, and he was incarcerated at the time of their murders. But again, he was charged with conspiracy to commit murder, which included a conspiracy related to the murders of Keys and Zechman. And although he was incarcerated at the time of the murders, the jury could still conclude that William-Salmon conspired and planned the murders from within jail. The trial court did not abuse its discretion by admitting this evidence in William-Salmon's case. *Chelmicki*, 305 Mich App at 62.

## E. PROSECUTORIAL ERROR[10]

Last, William-Salmon argues that the prosecutor improperly shifted the burden of proof to him during her rebuttal argument when she questioned why he had initiated plea negotiations. We review this preserved argument of prosecutorial error de novo by examining the challenged remarks in context to determine whether William-Salmon received a fair and impartial trial. *People v Thomas*, 260 Mich App 450, 453; 678 NW2d 631 (2004); *People v Rodriguez*, 251 Mich App 10, 29; 650 NW2d 96 (2002).

"Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "Prosecutorial comments must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial." *People v Brown*, 279 Mich App 116, 135; 755 NW2d 664 (2008). Prosecutors are given latitude with regard to their arguments. *People v Bahoda,* 448 Mich 261, 282; 531 NW2d 659 (1995). "They are free to argue the evidence and all reasonable inferences from the evidence as it relates to [their] theory of the case." *Id.* (quotation marks and citation omitted).

"While the prosecution may not use a defendant's failure to present evidence as substantive evidence of guilt, the prosecution is entitled to contest fairly evidence presented by a defendant." *People v Reid*, 233 Mich App 457, 477; 592 NW2d 767 (1999). Our Supreme Court explained in *People v Fields*, 450 Mich 94, 115; 538 NW2d 356 (1995), that "where a defendant testifies at trial or advances, either explicitly or implicitly, an alternate theory of the case that, if true, would exonerate the defendant, comment on the validity of the alternate theory cannot be said to shift the burden of proving innocence to the defendant."

As discussed earlier, evidence of William-Salmon's guilty plea was admissible at trial. Thus, the prosecutor was entitled to comment on that evidence during closing argument. Further, the prosecutor's remarks were responsive to defense counsel's arguments regarding the weaknesses of the prosecution's case, and that William-Salmon's guilty plea was not truthful (as evidenced by the prosecutor's motion to vacate the plea). It was not improper for the prosecutor

---

[10] This Court explained in *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015), that a more accurate label for most claims of prosecutorial misconduct is " 'prosecutorial error,' " while only the most extreme cases rise to the level of " 'prosecutorial misconduct.' "

to respond by arguing that William-Salmon's decision to initiate plea negotiations refuted the alleged weaknesses identified by the defense. The prosecutor's comments in rebuttal regarding that theory did not shift the burden of proof to William-Salmon. Rather, the prosecutor's argument that William-Salmon initiated the plea only tended to debunk William-Salmon's alternative theory. The remarks did not deny William-Salmon a fair and impartial trial.

## III. CONCLUSION

We vacate Caddell's convictions and sentences, and remand to the trial court for a new trial. We do not retain jurisdiction. William-Salmon's convictions and sentences are affirmed.

/s/ Christopher M. Murray
/s/ Brock A. Swartzle
/s/ Thomas C. Cameron